RUSSELL *vs.* JACKSON, ex dem. SCHUYLER and others.

For the purpose of raising a presumption or proving a *pedigree* in an action for the recovery of lands by *recitals* contained in an ancient instrument, the *probate* of a will as a will of *personal estate,* or the *record* thereof in the proper office, is admissible in evidence.

Evidence of *pedigree ;* and evidence to warrant the *presumption of an ancient grant.*

ERROR from the supreme court. This was an action of ejectment brought by the heirs of the late Gen. Philip Schuyler against Timothy Russell, for the recovery of a lot of land lying in that part of *Cosby's manor* in the county of *Oneida,* which is situate on the *south* side of the *Mohawk river.* The cause was tried in October, 1827, before the Hon. NATHAN WILLIAMS, then one of the circuit judges. The jury found a verdict for the plaintiff. The defendant having tendered and procured a bill of exceptions to be sealed, moved the court for a new trial; which motion was denied and judgment rendered for the plaintiff. The defendant thereupon sued out a writ of error. The facts detailed in the bill of exceptions for the purpose of presenting the questions of law raised upon the trial are voluminous, but are sufficiently detailed in the opinion of the CHANCELLOR. The cause was argued in this court, by

*C. P. Kirkland,* for the plaintiff in error.

*J. A. Spencer,* for the defendant in error.

After advisement the following opinion was delivered :

By the CHANCELLOR. The writ of error in this case is brought to reverse a judgment of the supeme court, by which the heirs of the late General Shuyler, the lessors of

the plaintiff in the court below, recovered a lot of land in the possession of Russell, the defendant, in that part of Cosby's manor which lies on the south side of the Mohawk river. It appears by the patents which were produced in evidence, that this tract of land, which was afterwards called Crosby's manor, was granted in two patents, to Joseph Worrell and others, on the 2d of January, 1734, as lands purchased from the Indians, by the German settlers, by license of Governor Burnet. General Schuyler derived title to the premises by a deed from Henry Augustus, Duke of Grafton, Charles Lord South Hampton and others, claiming to be the heirs at law of Lady Elizabeth Jeffreys formerly the wife of Lord Augustus Fitzroy, executed March 6, 1793, by John Watts as their attorney. And the two principal questions for our consideration are : *First.* Whether the evidence of pedigree, produced by the lessors of the plaintiff upon the trial, was sufficient to show that the grantors in the deed of 1793, to General Schuyler, were the grand children and heirs at law of Col. William Cosby, the former governor of the colonies of New-York and New-Jersey? and, *Second.* Whether the evidence was sufficient to authorize the presumption of a conveyance of Cosby's manor, by the original patentees thereof, to Gov. Crosby previous to his death?

Another question has been raised as to the evidence of the will of Gov. Cosby as a will of real estate. But though I agree with the supreme court, that the probate was legal evidence in this case under the statute, even if it had been necessary for the lessors of the plaintiff to trace their title through that will, the question is of very little importance in the decision of this cause. The evidence shows that Gov. Cosby had two sons, William and Henry ; and it appears to be wholly immaterial whether the descent of the premises in question to Lady Elizabeth Fitzroy, is traced through her brother William, as the oldest son, who by the common law was the heir of his father, or through him as the devisee of his father under the supposed will. In either case, to enable her to take the property by descent, it must be presumed that her brother Henry died without issue ; or at least that his issue had become extinct previous to her

Russell v. Schuyler.

death in 1788, as he or his issue, by the common law, would take by descent from the elder brother in preference to her. If William and Henry both died without issue, or if neither had any issue living at the time of her death, the real estate which formerly belonged to her father, and which had not been sold by his heirs or devisees in her lifetime, must necessarily belong to her: either as the heir of her father, or of William her oldest brother, or of her mother Orace Cosby, who was the sole devisee of all the real estate of Henry the younger brother. And for the mere purpose of raising a presumption or of proving a pedigree by the recitals contained in an ancient instrument, I think the probate of the will before the proper officer as a will of personal estate, or the record thereof in the proper office as required by law, must necessarily be of as much if not of more force than the production of an ancient will itself without any proof of its actual execution by the supposed testator; Mr. Justice Buller's opinion to the contrary notwithstanding. *See Bull. N. P.* 246. 1 *Moody & Rob.* 466.

To establish the pedigree of the grantors in the deed of 1793, to General Schuyler, and to show that their mother was the sister and only surviving heir of William, the eldest son of Governor Cosby, the lessors of the plaintiff called John Watts, who was born previous to 1750; he being seventy-eight years of age at the time of the trial in 1627. He testified that Lord Southampton, one of the sons of Lady Elizabeth Fitzroy, or Jeffreys, was connected with him by marriage, having married his first cousin; that he had seen him in this country in 1771, as a colonel in the British army, and afterwards in England, in 1785: that he also knew William Cosby, who resided at New Rochelle, and was reputed to be the only surviving son and the heir at law of William Cosby; and that he was supposed to be insane, and was reputed to have died unmarried, and without lawful issue. This witness also testified that he understood and believed, and it was generally reputed, that Elizabeth Cosby, the sister of William Cosby, of New Rochelle, married Lord Augustus Fitzroy; and after his death, married James Jeffreys, Esq., a commissioner of the custom in England; and that the grantors in the deed of 1793, were her

children and heirs; she having died previous to the execu-
tion of their power of attorney to him, in 1791. The evi-
dence of this witness, who testified that he derived his
knowledge of this family not only from general reputation,
but also from his connection with them, and from his having
acted as their agent in this country, is all the evidence which
could reasonably be required to establish pedigree, and to
trace descent under such circumstances. It is certainly as
good, if not better evidence, than inscriptions upon tomb
stones, or entries in bibles, and other religious books, in the
handwriting of persons whose writing is unknown; which are
sometimes resorted to for the purpose of establishing pede-
gree. *Roscoe on Ev.* 26. *Whitlock* v. *Baker*, 13 *Ves.* 514.
*Slaney* v. *Wade*, 7 *Sim.R.* 595. *Hood* v.*Beauchamp*, 8 *id.* 26.

This was also a case in which a witness connected as the
late John Watts was, with this family, by the marriage of
his cousin Ann, the daughter of Admiral Warren, with
Charles Fitzroy, the first Lord Southampton, could not well
mistake upon a question of pedigree and descent, which it
was only necessary to trace back for two generations. All
the grantors in the deed to General Schuyler, claimed to
be grandchildren of one of our provincial governors, and
some of them were themselves not unknown to fame, as
every reader of Junius' letters is well aware. In addition
to all this, two at least of the grantors in the deed of 1793,
were of the blood royal of the Stuarts; although the quar-
terings of their escutcheons, which indicated their descent
from the kings of England and Scotland, and of France,
were debruised by a baton sinister. For it is a matter of
public history that Henry Fitzroy, their great grand father,
the first Duke of Grafton, who was killed at the siege of
Cork, was one of the numerous illegitimate children of that
royal libertine of whom Horace Walpole said:

> "Fortune, or fair or frowning, on his soul
> Could stamp no virtue, and no vice control."

He was the second son of Barbara Villers, or Mrs. Palm-
er, one of Charles the second's seven favorite mistresses;
who was ennobled by that dissolute monarch, by the titles

Russell v. Schuyler.

of Baroness Nonesuch, Countess of Southampton, and Duchess of Cleveland. *See Rapin's Hist. by Tindal; Bishop Burnet's Own Times; Ward's British Hist.*; and *Granger's Biog. His.* The grandson of this first Duke of Grafton, Augustus Fitzroy, who died in 1741, in the lifetime of his father, the second Duke, married Elizabeth the daughter of Col. William Cosby, our colonial governor; and by her he was the father of Augustus Henry, Duke of Grafton, afterwards the prime minister of England; whose name was immortalized by the very powerful but still unknown pen of Junius. And he was likewise the father of Lieut. General Charles Fitzroy, who was created Lord Southampton, in 1780, and was afterwards groom of the stole to George III. *See Annual Reg.* 1787, *p.* 233. By a reference to Debrett's British Peerage, it will also be found that the witness was correct in supposing that Lady Augustus Fitzroy, the daughter of Governor Cosby, after the death of her first husband, married James Jeffreys. And as she died subsequent to our act of 1786, changing the course of descents, her lands in this state, by virtue of that act and the act of March, 1790, removing the disability of alienism, descended to her daughters and to Lord Southampton, her second son, as well as to the Duke of Grafton, her oldest son, who would have been the sole heir by the common law. All those children joined in the deed of 1793, which was executed, by virtue of their joint power of attorney to Watts, dated in 1791. I think, therefore, there can be no reasonable doubt that the premises passed to General Schuyler under that deed, if Cosby's manor belonged to Governor Cosby at the time of his death. Whether the other evidence was sufficient to authorize the jury to presume that the original patentees had conveyed their interests in the lands to Governor Cosby previous to his decease, is the other material question in the case; which question I will now proceed to consider.

The recital in the conveyance from Grace Cosby in 1762, is, after such a lapse of time, sufficient evidence of the fact that Governor Corby died shortly after the making of his will in 1735; although the date of the probate of that will

Russell v. Schuyler.

held under such leases, although there had never been any actual possession of the premises in question in that suit, under the conveyance which was presumed to have been so executed. *See also Beal's Lessee* v. *Lynn*, 6 *Harr. & John. Rep.* 336. The case now under consideration is certainly a much stronger one than the case of *Jackson v. Lunn*, from the fact that a part of the patentees were witnesses to Gov. Cosby's will, devising the manor as having been conveyed to him by them and their associates. The fact that the owner of this part of the manor was for many years previous to his death, supposed to be insane, accounts for no claim to the premises having been made by him, and of there being no attempt to settle upon this part of the manor previous to the revolution. His sister also must have been far advanced in years at the time of his death ; as her son was old enough to be the prime minister of England in 1767. And the disability of alienage not being removed until 1790, accounts for the fact that she did not attempt to exercise any acts of owership over this part of the manor during her life.

There was no legal evidence of the sale of any part of the land for quit rents ; and if such a sale had taken place during the lunacy of Wm. Cosby of New Rochelle, or after his interest had vested in the people of the state by escheat, it is probable that Gen. Schuyler, after the act of March 1790, thought it most safe to protect his title by a purchase from the heirs of Lady Elizabeth Jeffreys. The jury were therefore properly instructed to presume a grant from the patentees to Gov. Cosby, as recited in his will and in the conveyance to De Lancy.

There was no proof of a tenancy which entitled the defendant to notice to quit. His declaration that he had once paid rent to General Schuyler for the land, without stating whether such tenancy was from year to year, or for a certain specified term, even if it was legal evidence in his own favor, did not make out a tenancy or holding from year to year. And no notice to quit was therefore necessary.

For these reasons I am satisfied that the decision of the court below was correct, and that the judgment should be affirmed.

time not only the original will of Governor Cosby, but also the lease and release of the patentees, bearing date a very few days after the issuing of the patents ; as the deed recites even the christian names of the wives of the several patentees, and notices the fact that the husbands alone, signed the lease, but that their wives joined in the release, and states the consideration specified in each. The fair presumption therefore is, that the lease and release from the patentees were then in the hands of Sir William Johnson, the attorney of Grace Cosby, and not in the hands of the eldest son of Governor Cosby, under whom the lessors of the plaintiff claimed ; and they probably went into the hands of De Lancey, the grantee, as a part of the evidences of his title ; as they cannot be found among the papers of Sir William Johnson in the hands of his son and heir. By referring to the act of attainder of the 22d of October, 1779, 1 *Greenl. Laws*, 26, it will be seen that Oliver De Lancey, was attainted for adhering to the enemies of the state, and his property was confiscated. And it is a matter of public history, of which the records of our judicial tribunals also furnish abundant evidence, that most of the persons who were in that situation, sent their evidences of title to England, for the purpose of obtaining remuneration for their losses, from the government, to which they adhered in the revolutionary contest ; and that those evidences of title cannot now be obtained.

In the case of *Jackson* v. *Lamb*, 7 *Cowen* 431, a release of the whole of a tract of land was presumed, after the lapse of forty years, upon the prodution of the mutilated parts of a lease for one year, which recited that the object of such lease was to found a release thereon : and upon proof of the fact that some of the lots in the tract had been long possessed under title derived from the person named as lessee in such mutilated lease. And in the case of *Jackson* v. *Lunn*, 3 *Johns. Cas.* 109, a conveyance from the patentees to Admiral Warren, the father in law of this same Gen. Charles Fitzroy, was presumed after a great lapse of time, from the recitals of such a conveyance, which were contained in leases of parts of the patent which had been

held under such leases, although there had never been any actual possession of the premises in question in that suit, under the conveyance which was presumed to have been so executed. *See also Beal's Lessee* v. *Lynn,* 6 *Harr. & John. Rep.* 336. The case now under consideration is certainly a much stronger one than the case of *Jackson v. Lunn,* from the fact that a part of the patentees were witnesses to Gov. Cosby's will, devising the manor as having been conveyed to him by them and their associates. The fact that the owner of this part of the manor was for many years previous to his death, supposed to be insane, accounts for no claim to the premises having been made by him, and of there being no attempt to settle upon this part of the manor previous to the revolution. His sister also must have been far advanced in years at the time of his death; as her son was old enough to be the prime minister of England in 1767. And the disability of alienage not being removed until 1790, accounts for the fact that she did not attempt to exercise any acts of owership over this part of the manor during her life.

There was no legal evidence of the sale of any part of the land for quit rents; and if such a sale had taken place during the lunacy of Wm. Cosby of New Rochelle, or after his interest had vested in the people of the state by escheat, it is probable that Gen. Schuyler, after the act of March 1790, thought it most safe to protect his title by a purchase from the heirs of Lady Elizabeth Jeffreys. The jury were therefore properly instructed to presume a grant from the patentees to Gov. Cosby, as recited in his will and in the conveyance to De Lancy.

There was no proof of a tenancy which entitled the defendant to notice to quit. His declaration that he had once paid rent to General Schuyler for the land, without stating whether such tenancy was from year to year, or for a certain specified term, even if it was legal evidence in his own favor, did not make out a tenancy or holding from year to year. And no notice to quit was therefore necessary.

For these reasons I am satisfied that the decision of the court below was correct, and that the judgment should be affirmed.

On the question being put, *Shall this judgment be revers-
ed?* all the members of the court voted in the *negative.*
Whereupon the judgment of the supreme court was accor-
dingly AFFIRMED.